USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED : 1/3/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
:
UNITED STATES OF AMERICA                                :         S 10 Cr. 632 (GEL)
:
-v-                                                     :
:         **AMENDED**
THOMAS B. STRINGER,                                     :         **OPINION AND ORDER**
:
Defendant.                             :
:
-------------------------------------------------------x

GERARD E. LYNCH, Circuit Judge:

Following a five-day jury trial, defendant Thomas B. Stringer was found guilty on July

29, 2011, of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, and of aggravated identity theft,

in violation of 18 U.S.C. § 1028A. Stringer now moves for a judgment of acquittal pursuant to

Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial pursuant

to Rule 33. Those motions will be denied. His motion to unseal and docket certain documents

will be granted.

Stringer, who elected to proceed pro se on the morning of his trial, argues that his trial

was deficient because, inter alia, (1) he was forced to proceed pro se against his will and "under

legal and moral duress," and the Court erred in refusing to adjourn his trial after he chose to go

pro se; (2) the Court, the government, and Stringer's own appointed attorneys "have, collectively,

systematically, deliberately and in some cases grossly and willfully negligently denied [him] his

[c]onstitutional rights of due process[] to the extent that he was unlawfully prosecuted"; (3) the

government failed to "suggest[] any theory that the defendant . . . aided and/or abetted another"

until the government's rebuttal summation, and thereby "misled the court, misled the defendant,

misled the jury"; (4) because, as to the identity theft count, the government put into evidence that

Stringer stole the identities of *two* victims, but the jury determined that he was guilty of stealing

the identity of only *one* victim, Stringer should have been found not guilty of the entire count; (5)

he received ineffective assistance from appointed attorney Stanislao Germán prior to trial, as well

as during trial when Germán acted as standby counsel; and (6) the government "deliberately

withheld" <u>Brady</u> material from him as part of a "cover-up." For reasons set forth below, none of

these arguments is availing.

## BACKGROUND

Stringer was arrested in Florida in November 2007 and charged with several identity-theft

crimes in Florida state court. On April 16, 2010, in the Southern District of New York, federal

authorities charged him in a criminal complaint with bank fraud and aggravated identity theft.

Shortly thereafter, Stringer was brought from state custody in Florida to federal court in New

York pursuant to a writ of *habeas corpus ad prosequendum.* He was indicted on July 20, 2010,

and charged with bank fraud and aggravated identity theft. The case was assigned to Judge

Berman, and eventually transferred to the undersigned judge for trial.

The original indictment charged Stringer with causing counterfeit checks to be deposited

into and subsequently withdrawn from accounts at SunTrust Bank in Florida and JPMorgan

Chase in Manhattan, in violation of 18 U.S.C. §§ 1344 and 2, and with using the name of another

person ("Victim-1") to open a bank account at SunTrust Bank, to deposit counterfeit checks in

that account, and to sign counterfeit checks in the name of another person in furtherance of the

bank fraud, in violation of 18 U.S.C. § 1028A(a)(1), (c)(5). On June 30, 2011, a grand jury

returned a superseding indictment that made minor alterations to the original indictment,

principally to Count Two, which now charged Stringer with using "one and more names," rather

than "the name of another person ('Victim-1')" as had been alleged in the original indictment.

Before trial, Stringer announced that he might want to proceed pro se. Accordingly, on

the first morning of trial, July 25, 2011, the Court discussed the issue with him at length. After

confirming that he indeed wished to represent himself and understood the risks of doing so, the

Court conducted an extensive colloquy, pursuant to Faretta v. California, 422 U.S. 806 (1975), to

ensure that his decision was knowing and intelligent. See July 25, 2011, Tr. 37-64; see also id. at

87-88, 92-93. The Court concluded that it was, and granted Stringer's request, but assigned his

appointed counsel, Stanislao Germán, to continue to act as his standby counsel.

      At trial, the government's evidence included testimony from seventeen witnesses and

numerous exhibits. The evidence of Stringer's guilt on both counts was overwhelming. It

included a laptop found on Stringer when he was arrested, which he acknowledged at the time

(by signing his name to an evidence voucher) was his property. The police officer who had

arrested Stringer and seized the laptop testified that Stringer had told him after the arrest, "I know

you have my laptop. You're probably going to get what you're looking for. My request is can

you please save my personal files?" On the laptop was a check-making program called

VersaCheck that, as government witnesses testified and as data files from the computer showed,

had been used to create the twenty-two counterfeit checks at issue in the case. Spreadsheets

stored on the computer's hard drive contained data that matched the check information exactly.

      The checks were drawn on the JPMorgan Chase account of a company called

Generational Arts. A former bookkeeper at Generational Arts testified that the twenty-two

checks at issue were not issued by Generational Arts because, among other reasons, they did not

resemble Generational Arts checks. Those checks were deposited into two SunTrust corporate

bank accounts in Florida – accounts that Stringer had opened under the names of two fake

companies, "Jef Group" and "Fosmath," which he had created using the stolen identities of

Tiefenbach and Matheson. When he opened the accounts, Stringer used the addresses of two

mailboxes that he had rented using their identities. Tiefenbach and Matheson testified that they had no connection to these companies or bank accounts, nor did either of them rent the mailboxes used to open the accounts. The jury also saw the driver's license that one of the mailbox rental companies had on file for the box that Stringer had used to open the Fosmath bank account. The driver's license bore the name of Matheson but the photo of Stringer.

A witness from the Florida Department of Highway Safety and Motor Vehicles ("DHSMV"), Amy Crowson, testified why she was certain that this license was a counterfeit. She explained that Florida drivers' licenses bear "form numbers," that each form number is unique to the license holder, and that a form number is created using the license holder's name, date of birth, and address, among other information. The license bearing Matheson's name but Stringer's photo contained a form number that matched the form number on the Florida state identification card that Crowson testfied the state had originally issued to Stringer. In addition, Crowson explained why she could tell, based on certain design features of the DHSMV's cards, that the counterfeit license at issue here was in fact a Florida state identification card that had been altered to look like a driver's license. The license bearing Matheson's name but Stringer's photo was therefore, she testified, a forgery. The government also introduced evidence that when Stringer was arrested, he was carrying three fake licenses, each bearing his photograph but other people's names. Each license bore the same unique form number as Stringer's Florida state identification card. Additional evidence showed that Stringer had used Tiefenbach's identity in a similar manner.

In addition, the jury saw extensive evidence of Stringer's research into how to commit his bank fraud and how to use other people's identities. Among this evidence was the address book on Stringer's laptop, which contained personal information about Tiefenbach and Matheson,

4

including their home addresses. Also stored in the laptop's memory was Stringer's Internet browsing history and saved "favorites," which showed that Stringer's laptop had been used to access websites concerning bank routing numbers, U.S. driver's license numbers, check-writing software, the Florida Division of Corporations, and sample images of a Florida driver's license and a Florida identification card.

Stringer did not present a case, aside from reading aloud a stipulation that he and the government had signed. It specified that an FBI agent named Adrian Busby had prepared a report in the case which stated, among other things, that during a telephone interview with Valerie Woliver, one of the government's witnesses at trial, and Woliver told Busby that Matheson had rented a mailbox from her business. July 28, 2011, Tr. 653-54.

After deliberating for roughly four hours, the jury returned a verdict of guilty on both counts of the superseding indictment, although they concluded that under Count Two, Stringer was guilty of stealing the identity of only one of the two victims listed on the special verdict form, Tiefenbach. As to Matheson, the other alleged victim, the jury found Stringer not guilty of identity theft.

After trial, Stringer requested that the Court assign new counsel to represent him during post-trial proceedings. The Court granted this request and appointed J. Bruce Maffeo. Stringer eventually grew dissatisfied with Maffeo's representation and announced his intention again to proceed pro se. The Court held another conference to discuss the matter with Stringer. After engaging in a colloquy to ensure once again that Stringer's decision was knowing and voluntary, the Court accepted Stringer's request. He then moved, pro se, for acquittal or a new trial, pursuant to Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure.

# DISCUSSION

## I. Rule 29 Motion for Acquittal

Under Rule 29, after a "jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal" if the evidence is insufficient to support the verdict. Fed. R. Crim. P. 29(c)(2). A defendant who challenges the sufficiency of the evidence that supported his conviction "bears a heavy burden." United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001). In considering a motion for acquittal under Rule 29, the Court must view the evidence "in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government," United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) (internal quotation marks, brackets, and ellipses omitted), and "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt," United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (internal quotation marks omitted); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.").

Despite citing Rule 29, see Def.'s Br. 1, Stringer does not appear to challenge the sufficiency of the evidence against him. The closest he gets is to lament that the government's case "amounted to a bombardment of circumstantial evidence mostly gathered/obtained from an indicted and now convicted FBI Agent who was very deliberately kept from participating at trial and very suspiciously not remembered by nearly everyone [sic] of the government witnesses at

6

trial." Def.'s Br. 6.[1]  Even under the "less stringent standards" to which this Court holds submissions from pro se litigants, see Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d Cir. 1993) (internal quotation marks omitted), that statement does not constitute a colorable challenge to the sufficiency of the government's evidence.  "[A] conviction based on speculation and surmise alone cannot stand," United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994), but the government is unquestionably allowed to "prove its case solely through circumstantial evidence" so long as "the government still demonstrates each element of the charged offense beyond a reasonable doubt," United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2008).

Even assuming that Stringer properly raised an insufficiency claim, the government introduced ample evidence at trial – both direct and circumstantial – from which the jury could properly conclude beyond a reasonable doubt that Stringer committed the bank-fraud and identity-theft crimes charged in the superseding indictment.  As discussed above, the evidence introduced at trial on the bank-fraud count included, inter alia, testimony from the former bookkeeper at Generational Arts that the checks introduced into evidence were not Generational Artss checks; testimony from a bank employee that the checks were unquestionably counterfeit and exposed JPMorgan Chase to loss; evidence that the check-making software found on Stringer's laptop had been used to create the fake checks; spreadsheets on the laptop that listed the dates and dollar amounts of all of the fake checks introduced into evidence; Stringer's statement to the police that they would likely "get what [they were] looking for" when they searched his laptop; and testimonial and documentary that Stringer had rented the two mailboxes at the addresses used to open the SunTrust accounts into which the fake checks were deposited.

---

[1] Stringer also argues that the government failed to present any evidence to support its aiding-and-abetting theory.  That argument fails for the reasons explained in part II.C, infra.

As to the identity-theft count, the evidence introduced at trial included, inter alia, fake drivers' licenses, found on Stringer at the time of his arrest; testimony from a Florida DHSMV employee describing the state's processes for issuing drivers' licenses and I.D. cards, and how such documents can be forged; testimony and documentary evidence showing that Stringer had used Tiefenbach's identity to register a dummy corporation in Florida, to open a corporate bank account into which fake checks were deposited, and to rent the mailbox at the address used to open that account; and testimony from Tiefenbach that he did not know Stringer, had no knowledge of his scheme, and had never consented to Stringer's use of his identity.

In short, the evidence of Stringer's guilt on both counts was abundant, and Stringer has provided no basis on which the Court could conclude that, "when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty." United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotation marks omitted).

Because the jury's verdict on the bank-fraud and identity-theft counts is supported by sufficient evidence, the motion for a judgment of acquittal pursuant to Rule 29 is denied.

II. Rule 33 Motion for a New Trial

Rule 33 provides that upon the defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992) (internal quotation marks omitted); see also United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998); United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).

"In exercising [its] discretion . . ., the court is entitled to weigh the evidence and in so

doing evaluate for itself the credibility of the witnesses." <u>Sanchez</u>, 969 F.2d at 1413 (internal

quotation marks omitted). However, in exercising this discretion, a district court "may not

wholly usurp the jury's role." <u>United States v. Robinson</u>, 430 F.3d 537, 543 (2d Cir. 2005)

(internal quotation marks omitted). "[M]otions for new trials are not favored and should be

granted only with great caution." <u>United States v. Costello</u>, 255 F.2d 876, 879 (2d Cir. 1958);

<u>see also</u> <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995) (noting that "motions for a

new trial are disfavored in this Circuit" and that "the standard for granting such a motion is

strict"). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be

a manifest injustice," and in order to grant such a motion a district court must have "a real

concern that an innocent person may have been convicted." <u>Ferguson</u>, 246 F.3d at 134.

　　　　The Court has no such concern here. Stringer received a fair trial, and nothing in his Rule

33 motion persuades the Court otherwise. Far from having any question about the correctness of

the jury's verdict, the Court itself is fully persuaded that the defendant is guilty beyond a

reasonable doubt of the counts of conviction.

　　A. <u>Stringer's Choice to Proceed Pro Se and the Court's Decision Not to Adjourn Trial</u>

　　　　　　1. <u>Decision to Proceed Pro Se</u>

　　　　Stringer claims that "he was forced, having no other options, to proceed as pro se, ON

THE DAY TRIAL BEGAN" and that "the Court refused to allow [him] to proceed pro se, until

the day trial began." Def.'s Br. 9 (internal quotation marks omitted). The record belies these

claims. The Court conducted extensive discussions with Stringer prior to trial about whether he

was satisfied with the representation he was receiving from Germán and whether he wished to

represent himself; gave him numerous opportunities prior to trial to make that decision;

cautioned him about the risks of going pro se; and warned him that he would not gain any

strategic advantage by switching to pro se status on the eve of trial. Stringer made the decision to represent himself with eyes wide open.

The pre-trial record makes clear that Stringer fully understood the consequences of this choice, that he made it freely, and that his claims to the contrary are part of a long pattern of strategic behavior. In 2010, when Stringer made his initial appearance in the Southern District of New York, attorney Martin Cohen of the Federal Defenders of New York was assigned to represent him. Cohen eventually asked to be relieved from the case because Stringer had written letters to *USA Today*, to Cohen's supervisors at the Federal Defenders, and to the New York City Bar Association complaining about Cohen's representation. The Court granted Cohen's request and appointed Germán to represent Stringer. Subsequently, Stringer expressed full satisfaction with Germán's work. See, e.g., May 12, 2011, Tr. 22 (describing himself as "perfectly happy with [his] attorney"). Indeed, it was not until five weeks before trial that Stringer wrote to the Court to complain about Germán's representation, and raised the possibility of getting a new attorney. When the Court held a conference to discuss that issue, however, Stringer told the Court he did not intend "to ask [his] lawyer to be replaced." June 13, 2011, Tr. 19. After the Court told Stringer that it had "heard nothing whatsoever in this proceeding to suggest that Mr. Germán [was] not diligently representing his client," the Court informed Stringer that he still had

> every right to make an application for a change of counsel if that is something you think is appropriate at any time going forward. But let me tell you a couple of things about what is going to happen here. Number one, we're going to trial on July the 25th. It certainly behooves you and your attorney to focus on preparing for that trial. It is going to happen. . . .
>
> Now I want to tell you about my attitude about these things. It was always my practice that any defendant – rather more of a liberal practice than the rules may strictly provide for – that any defendant with an appointed lawyer was entitled to a second

opinion, and I was always quite free to grant one application for change of counsel. Now [you have already had one change of counsel.] And now you have got a lawyer who, as of a month ago, you were happy with. I have heard all of the issues out and I see no reason to think that you should not be happy with this lawyer at this moment.

If there is some basis to think that there is a good reason for a change of counsel between now and July 25th, I will certainly hear it. But do not think – I don't say that you do think, but do not for a minute get it into your head that there is going to be some tactical advantage to trying to change attorneys here. This is your attorney, barring some actual reason justifying a change of counsel. This is your trial date. It is not going away. . . .

And do not expect – and I heard you out, I will hear you out if there is something important, but don't think each pretrial proceeding here or each day of trial will be an occasion for you to second guess your lawyer's judgment calls. You have certain rights. I will tell you about some of them right now. . . . It's for you to decide whether to plead guilty or go to trial. It's for you to decide whether to testify at trial. He's going to give you advice whether to testify at trial, I'm sure, if that comes up. He may even try to vigorously persuade you to testify or not to testify or whatever he thinks is in your interest, but it's your choice whether to do that. But as to whether he objects to this question or whether he makes this motion or that sort of thing, that's the lawyer's domain, and he's going to be making those judgments. And as long as you've got a lawyer, the lawyer is the one who makes those judgments.

Id. at 33-36.

Nearly a month later, Stringer informed the Court that he now wished to have new counsel appointed. The Court convened the parties on July 7, 2011, and denied Stringer's request, explaining that the trial date had been set for more than two months, and that "we are too close to trial to have a change of counsel without a continuance of the trial":

This is a case that has been pending for over a year. It was assigned to me for trial in large part to get the trial done because Mr. Stringer had quite understandably expressed concerns about his speedy trial and because Judge Berman apparently had other

11

matters to attend to.  And so the case was set for a particular date.

      There are important reasons, both in terms of the public and the defendant's right to a speedy trial and in terms of court administration, why that trial date should remain.  Indeed, if it was adjourned, I don't know when it would be adjourned to.  It would no longer be possible for me to try the case. . . .

      It's a congested court; we try to get these things done efficiently.  There are important reasons weighing in favor of no continuance and a chance of counsel would require a continuance.  Now, in my view, the defendant's right to effective counsel is paramount and if there were some serious question as to Mr. German's ability to proceed with this case, that would make a significant difference.  That's why I have spent this much time trying to understand what the issues are and whether there is some difficulty with the way that Mr. German is handling the case.  What I have seen is that there is not.

      The kinds of motions that Mr. Stringer apparently would like to see made or would have liked to see made are, first, ones that are within counsel's discretion to bring. . . .

      Any reasonable attorney will consult with the client as to the client's wishes.  Any experienced attorney should and will spend time with the client explaining the reasons for these decisions, but that time is not unlimited.  Counsel is required to focus on what is important and can't spend an endless amount of time any more than the court can revisiting these various decisions and explaining the rationale for all of the moves that are made and are not made. . . .

[T]o the extent I have made the inquiry, it is my observation and my judgment that Mr. German is proceeding in a manner that is not susceptible to be second-guessed.  It seems to me that the motions that he has not made or not pursued don't seem to me to have any value and would have been denied if made.  So I don't see any failure of representation here. . . .

We simply have a client who has strong views of what he thinks should be pursued, and we have a lawyer who quite understandably has so far found some of those views not to be productive. . . .

So, the application for a change of counsel is denied.  Mr. German, I suppose I need to ask you, do you feel you are able to proceed in

this matter, to conduct this trial effectively and to make any such motions or legal arguments as remain to be made?

MR. GERMAN: Yes, your Honor.  I mean, the issue essentially, your Honor, is that when there is a disagreement over strategy or over what motion to file Mr. [Stringer] takes the position that now he doesn't have confidence, now he doesn't trust me, then he writes these letters and we are kind of back at square one.  So, I am prepared to go forward.

I would not be surprised if there is, even as this evolves because I pursue a certain strategy, a certain way of doing things, essentially the situation where Mr. Stringer simply wants me to adopt every single position that he believes is the way something should go forward, and that's not just the way representation works.  I am prepared to go forward.

THE COURT: We have made clear to him as to what your role is. I have made clear that there are certain decisions that are his and his alone but that other decisions of tactics and strategy are for counsel to make.

July 7, 2011, Tr. 19-23.

Upon further reflection in response to the post-trial motion, the Court remains convinced that this decision to denial Stringer's request for substitution of counsel was correct.  Whether to grant a motion for substitution of counsel is a determination left to the discretion of the district court, which has a duty to investigate when a defendant complains about his counsel:

When, for the first time, an accused makes known to the court in some way that he has a complaint about his counsel, the court must rule on the matter.  If the reasons are made known to the court, the court may rule without more.  If no reasons are stated, the court then has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known.

McKee v. Harris, 649 F.2d 927, 934 (2d Cir. 1981), quoting Brown v. United States, 264 F.2d 363, 369 (D.C. Cir. 1959) (Burger, J., concurring) (brackets omitted); see also United States v. John Doe No. 1, 272 F.3d 116, 122-23 (2d Cir. 2001).  The Court fulfilled this duty, conducting

13

an extensive inquiry and concluding that Stringer's reasons for requesting new counsel amounted ultimately to disagreements about trial strategy, and thus were meritless.

"Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing; although it may not compel defendant to proceed with incompetent counsel." United States v. Schmidt, 105 F.3d 82, 89 (2d Cir. 1997). "On the eve of trial, just as during trial, a defendant can only substitute new counsel when unusual circumstances are found to exist, such as a complete breakdown of communication or an irreconcilable conflict." Id. Stringer provided no argument before trial, and to this day provides no argument, that meets this standard. Moreover, he had already forced a previous change of counsel by making unsubstantiated public charges against his prior attorney, and Judge Berman had earlier noted that Stringer had engaged in similar behavior in Florida. In addition, Stringer's declaration of dissatisfaction with Germán came less than three weeks before a trial that had been scheduled for more than four months, in a case that by then had been pending for well over a year. Appointment of new counsel, particularly in the summer vacation months, would unquestionably have resulted in a lengthy delay to provide new counsel time to prepare for trial. Stringer had declined to seek replacement counsel just weeks earlier, at the June 13, 2011, conference, and had been warned that time was running out.

At the July 7, 2011, conference, the Court informed Stringer that because counsel was not going to be replaced, his options were to proceed with present counsel or to proceed pro se, and that if he decided to represent himself, he should inform the Court on the morning of the first day of trial, which was 18 days away. July 7, 2011, Tr. 25-27. Thus, Stringer's election to proceed pro se on the first day of trial was no sudden impulse, but was a decision for which he had nearly three weeks to prepare. At the opening of the trial, the Court conducted an extensive Faretta

14

colloquy with him in order to determine whether he was choosing self-representation knowingly and intelligently. See July 25, 2011, Tr. 37.  The Court warned Stringer at length about the disadvantages and risks of self-representation, and Stringer affirmed that he understood those risks.  Far from forcing him to proceed pro se, the Court, while making clear that it was Stringer's choice how to proceed, strongly counseled him – as required by Faretta – on the likely disastrous consequences of so proceeding.  Stringer's argument that he was "forced" to proceed to trial without representation is essentially an attack on the Court's rejection of his request to replace Germán as counsel.  As already discussed, however, that rejection was entirely correct.

At the end of the Faretta colloquy, the Court concluded that Stringer's choice to represent himself at trial was indeed knowing and intelligent, and accepted his request to go pro se.  The Court also appointed Germán as Stringer's standby counsel.  As this history makes clear, Stringer had ample opportunity to request new trial counsel or to elect to proceed pro se at earlier stages of the case, but he waited until the last minute before trial – in clear contravention of this Court's warnings and instructions – to attempt to effect a change of counsel apparently with the hope that he might be able to delay trial.  When that attempt was rejected, he freely chose to represent himself rather than to continue with the attorney who had represented him for many months, because he preferred to reject the lawyer's choice of strategy.  In no way was Stringer forced to proceed pro se.

### 2. Request for a Continuance

Stringer also argues that the Court should have adjourned the trial to allow him more time to prepare his pro se defense.  For reasons discussed above, that argument is unpersuasive. Stringer had had many months, and the assistance of two attorneys, to develop a defense.  The trail date had been set for nearly four months, and any adjournment would have forced an

indefinite delay of the trial of a case that had been pending for over a year, and a change in the presiding judge, as Stringer well knew. Stringer had been specifically advised, moreover, of the consequences of waiting until the eve of trial to request appointment of a new attorney or to switch to pro se status. Under these circumstances, a continuance clearly was not justified.

A district court has "largely unfettered discretion . . . to deny or to grant a continuance." Sanusi v. Gonzales, 445 F.3d 193, 199 (2d Cir. 2006); see also Morris v. Slappy, 461 U.S. 1, 11 (1983) (district courts enjoy "broad discretion . . . on matters of continuances"). A decision to deny a defendant's request for a continuance "will not be reversed absent a showing of both arbitrariness and of prejudice to the defendant." United States v. Arena, 180 F.3d 380, 397 (2d Cir. 1999). The "burden" faced by district courts in preparing for trial, including "assembling the witnesses, lawyers, and jurors at the same time," "counsels against continuances except for compelling reasons." Morris, 461 U.S. at 11.

Such "compelling reasons" were absent here. The interests of court administration and a speedy trial – something that Stringer had previously complained he had been denied – outweighed Stringer's interest in a continuance. By the morning of trial, Stringer had had more than 14 months to prepare his case; his last-minute requests and maneuvers were plainly efforts to disrupt the proceedings and delay the trial. And the Court had made clear to Stringer at conferences on June 13, July 6, and July 7, 2011 – weeks before Stringer decided to go pro se – that it would not adjourn the trial date simply because Stringer requested new counsel or elected to represent himself on the eve of trial.

Nor was Stringer prejudiced by the denial of his request for a continuance. He claims that a continuance was necessary because the superseding indictment – filed June 30, 2011, nearly a month before trial – added the phrase "one and more victims," and Stringer needed time before

trial to determine the identities of these alleged multiple victims. Def.'s Br. 10. But at a conference on July 6, 2011, the Court ordered the government to provide Stringer with the names of these victims, and the government did so. The victims' names also appeared in the Rule 16 materials the government provided to Stringer beginning more than a year before trial. Additionally, Stringer claims that a continuance was necessary to give him additional time to work with an investigator, but Stringer fails to explain how more time would have helped his defense, or why he could not have brought the matter to the Court's attention earlier.

Accordingly, the Court's decision to deny Stringer's request for a continuance was not arbitrary, nor did it violate Stringer's due process rights. The decision therefore provides no basis for granting a new trial pursuant to Rule 33.

B. The Alleged Conspiracy Between the Court, the Government, and Defense Counsel

Stringer makes several vague and sweeping allegations that this Court, the government, and appointed defense counsel have conspired to deny him due process, to prosecute him illegally, and "to cover-up their and others['] respective dereliction of duty." Def.'s Br. 1-6. He appears to be particularly upset by the government's decision to transfer his case from Florida to the Southern District of New York – a decision that he claims the government made because "[t]he initial Florida case" against him "was failing miserably for the prosecutor and so with a wave of a wand, the case, very unexpectedly and unjustly," was "transferred to New York." See id. at 6. The Court has already discussed these allegations on the record in pre-trial proceedings, concluding that it was the prerogative of the executive branch to decide whether and when to commence a federal prosecution. See June 13, 2011, Tr. 4-5, 12-13; July 7, 2011, Tr. 8-10. Stringer's Rule 33 motion presents no reason for departing from the Court's previous rulings, and certainly no basis from which to conclude that a new trial is warranted.

17

C. The Government's Aiding-and-Abetting Theory

Stringer argues that the government did not provide him with sufficient notice of its

aiding-and-abetting theory, and failed to present evidence to the jury that he was an aider and

abettor (rather than a principal) of the bank fraud.  Def.'s Br. 7-8.  Both arguments are meritless.

The aiding-and-abetting statute, 18 U.S.C. § 2, provides that "[w]hoever commits an

offense against the United States or aids, abets, counsels, commands, induces, or procures its

commission, is punishable as a principal."  18 U.S.C. § 2(a).  A defendant may be convicted

under the statute "of aiding and abetting a given crime where the government proves that the

underlying crime was committed by a person other than the defendant, that the defendant knew

of the crime, and that the defendant acted with the intent to contribute to the success of the

underlying crime."  United States v. Hamilton, 334 F.3d 170, 180 (2d Cir. 2003).  "[A]n

indictment charging aiding and abetting may be proven by demonstrating that the aider and

abettor was in fact a principal," United States v. Knoll, 16 F.3d 1313, 1323 (2d Cir. 1994), and

"one who aids and abets the commission of a crime is not only punishable as a principal but is a

principal," United States v. Oates, 560 F.2d 45, 55 (2d Cir. 1977).  Thus, "courts have

encountered no difficulty sustaining convictions when the indictment did not specify whether the

defendant was the aider and abettor or the principal."  Knoll, 16 F.3d at 1323 (internal quotation

marks omitted).

Stringer contends that "[n]o aiding and abetting statute or charge, 18 U.S.C. § 2, shows

anywhere in the indictment or any other of the charging documents," Def.'s Br. 7, but one page

later in his brief he admits that, "[a]s the defendant re-reads the indictment, it does appear that 18

U.S.C. § 2 is cleverly cloaked," Def.'s Br. 8.  Far from being "cloaked," the aiding-and-abetting

charge was present from the beginning.  The original federal complaint, filed on April 16, 2010,

included an aiding-and-abetting charge. The original indictment, dated July 20, 2010, included the same charge; the aiding-and-abetting charge likewise appeared in the superseding indictment returned on June 30, 2011, and in the government's requests for jury instructions, submitted on June 30, 2011 ("In addition to charging the defendant with committing bank fraud, Count One of the Indictment also charges the defendant with, first, aiding and abetting substantive bank fraud and, second, willfully causing bank fraud."). Accordingly, Stringer had ample notice of the aiding-and-abetting charge, and cannot plausibly argue that the government's aiding-and-abetting theory somehow caught him off guard.

For the reasons already discussed, the jury heard ample evidence to support a conviction on either a principal or accessory theory. Furthermore, Stringer's own summation implied that he might not have acted alone in carrying out the charged scheme, suggesting that although he was "not a saint," July 28, 2011, Tr. 699, he could not have committed all of the acts the government attributed to him.[2] It was in response to this summation that the government, in its

---

[2] E.g., July 28, 2011, Tr. 715-16 ("There was another check, supposedly, or another account, let's just say, with another signature on it, that got deposited into another account. Why is this not being discussed? Where did this check go? Did it go to another location somewhere? I mean, what is this – because two different accounts from them, but they only talk about one account here . . . and then there's another account with some deposits for smaller amounts, it looks like, but nobody has ever discussed how that account information was gotten. . . . So I don't – I never really connected that whole thing. So I mean, I just can't imagine that one check went somewhere, another check went somewhere else, and somehow somebody figured out that they go together and – I don't know. I – it just didn't come together."); id. at 718 (arguing that a driver's license bearing Stringer's name "has been reissued since I've been in jail . . . . I'm in jail. I can't do those kinds of transactions. So I don't know what's going on with that. But it's a fact. It's there."); id. at 718-19 (wondering "why there's no pictures of me doing any of these financial transactions," noting that "[t]here's no surveillance" from banks or stores where Stringer was alleged to have perpetrated the fraud, and claiming that "[t]here's big links that don't link and don't connect"); id. at 720 (arguing that he "[c]an't be two people at once"); id. at 723 ("The crime did not occur the way that it's being described to you. This case has left a giant gaping hole that just can't be ignored."). Whatever the merits of these contentions, they all argue that Stringer did not commit every act attributed to him. If the jury agreed with that proposition, there was still ample evidence for the jury to conclude beyond a reasonable doubt that Stringer

rebuttal, told the jury that, under an aiding-and-abetting theory, "[t]he defendant can also be guilty of Count One of the indictment if the defendant aided and abetted the commission of bank fraud.  This means that even if there were other people involved, it doesn't make the defendant less guilty. . . . [T]he defendant can be found guilty of aiding and abetting the bank fraud so long as the government can prove that the defendant knew that a crime was being committed, that he knowingly did some act for the purpose of aiding or encouraging the commission of the crime, and he did so with an intention that the crime charged be committed."  July 28, 2011, Tr. 725. This was an entirely proper statement, and consistent with the Court's instructions to the jury, which had been distributed to the parties in advance of summations.  Thus, there is no merit to Stringer's argument that the aiding-and-abetting charge was somehow improper.

### D.  Special Verdict Sheet and the Jury's Verdict on Count Two

Stringer argues that because he was found not guilty of aggravated identity theft with respect to *one* of the two victims listed in Count Two of the special verdict sheet (Matheson), he was therefore not guilty of that *entire count* – even though the jury found him guilty with respect to the *other* victim (Tiefenbach).  Def.'s Br. 17.  Stringer claims that "the outcome of the verdict [in Count Two] is evidence that the jury believed one victim was not a victim at all, and there is no way for the defendant to determine whether that makes that person complicit."  Id. at 18. "[B]ecause the jury reached a verdict of not guilty on one and guilty on the other," Stringer argues that the count cannot be separated for the purposes of singling out one verdict from another," which he asserts "denies the defendant from being [able] to separate elements in the count for appeal and challenge with respect to the government meeting its prosecutorial obligations in securing a conviction."  Id. at 19.  Stringer argues that because he is "not guilty on

---

culpably participated in the bank-fraud and identity-theft schemes.

the portion of the Count Two" concerning Matheson, "then under the premise of criminal

conduct and elements of the statute," the other victim, Tiefenbach, "acted in exactly the same

capacity as" the first victim, and thus "it is necessary that either both names and victims are

equally involved or not involved in the crime itself and by virtue of evidence presented and

whether or not it is believed by the jury, it must be that the defendant is either guilty of both

names or not guilty of both names." Id.

As this Court explained in a post-trial order dated August 4, 2011, Stringer apparently

misunderstands the special verdict sheet. As stated then:

> Defendant's motion papers suggest that he is under the
> misapprehension that he was acquitted, rather than convicted, on
> Count Two. This is incorrect. The jury found the Defendant guilty
> of aggravated identity theft as charged in that count. Although the
> jury found him not guilty with respect to *one* alleged victim (Dean
> Matheson), it expressly found him guilty of aggravated identity
> theft with respect to the other (Jeffrey Tiefenbach). That finding
> suffices to convict him of the offense. A finding of guilty with
> respect to either of the two victims is sufficient to convict on that
> count; the not guilty verdict with respect to one victim is not, as the
> Defendant would have it, "the controlling verdict" that results in
> acquittal on that count. Since Count Two of the superseding
> indictment was arguably duplicitous in charging crimes against two
> separate victims, the Court at two pretrial conferences stated its
> willingness to hear a motion to require the Government to charge a
> separate count for each victim, but defense counsel declined the
> invitation to add another felony charge to the indictment, thus
> avoiding the risk of conviction on two separate counts each
> carrying mandatory consecutive sentences. *See* 7/6 Tr. 10-11; 7/7
> Tr. 15. In lieu of such a motion, and with no objection from
> defense counsel, the Court elected to include special jury questions
> for each alleged victim to ensure that the jury was unanimous with
> respect to each victim as well as to assist this Court in evaluating
> any post-trial motions and deciding upon sentence, the Court of
> Appeals in reviewing the judgment, and any future court in
> determining the Double-Jeopardy consequences of the judgment.
> Defendant did not object to this procedure after electing to proceed
> pro se.

Aug. 4, 2011, Order 1.

Stringer apparently remains under a misapprehension about the jury's verdict with respect to Count Two. He argues that "[w]hile it may be true that the defendant is 'ALSO' found 'guilty' in the same single count of the indictment, the government, the court, cannot have it both ways." Id. In fact, there was nothing "impermissibly duplicitous" about the verdict form, because it did not improperly "combine[] two or more distinct crimes into one count," nor was Stringer "prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001). The aggravated identity theft against the two victims named in Count Two was properly charged in a single count because "those acts could be characterized" – and in fact the government here *did* characterize them throughout the trial – "as part of a single continuing scheme." See United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989). The purpose of the special verdict form was to *avoid* confusing the jury. In addition, as the Court explained to the parties before trial and at trial, the special verdict form would benefit Stringer because he would avoid the possibility of being convicted of two separate counts of identity theft. See July 6, 2011, Tr. 10-11; July 7, 2011, Tr. 15; July 27, 2011, Tr. 620-21.

The jury's verdict was unambiguous: it found Stringer guilty of Count One *and* guilty of Count Two, albeit with respect to only one of the two named victims. Aggregation of the identity-theft crimes into a single count on the verdict form was clearly permissible here because "the essence of the alleged crime [was] carrying out a single scheme to defraud." Tutino, 883 F.2d at 1141. Stringer's objection to the special verdict sheet on duplicity grounds is therefore without merit.

Finally, to the extent Stringer argues that the verdicts were inconsistent, he is incorrect.

Stringer repeatedly argued to the Court[3] and implied to the jury[4] that the named victims might not have been victims of identity theft, but may have somehow lent their identities to the scheme as culpable participants. This contention resulted in an instruction to the jury, essentially along lines proposed by Stringer and his counsel, about the legal viability of such a defense. The jury was entitled to have a reasonable doubt about the credibility of either victim, and evidently chose to entertain such a doubt about Matheson – a recovering alcoholic with a criminal record, who could not clearly recall all the details of his formerly turbulent life – and not about Tiefenbach, an established businessman with much more to lose and little to gain from participation in a squalid scheme such as Stringer's.

---

[3] E.g., Def.'s July 26, 2011, Ex Parte Mot. 4 ("There are checks made out to the alleged victims and this issue has not been explained or investigated."); id. at 3 (arguing that "[s]ome continuation of identity theft" after Stringer's arrest "is evidenced within the discovery provided," and this "surprising information shows 'another's involvement' perhaps collusion, in which the defendant is not and can not be involved"); July 26, 2011, Sealed Proceedings Tr. 7-8 ("I happen to know the entire truth of the whole thing that's going on. I do see that the government has gone too far. Like I said to the jury, they go too far in what it is that they're, you know, trying to prove, and I don't really believe it's because they don't know. I believe it's because they're trying to trump something up here in a bigger way than what it is. . . . It really struck me that, you know, conspiracy theory or not, ghosts and goblins, as you said before, or not, I feel like somebody's out to get me and they're putting things in too big of a overall, overcharging capacity and that I'm not comfortable with, and I'm going to fight. I need to find answers because I don't know all of the answers. I do know that part of what they're accusing me of is absolutely not true. I'm certainly not going to implicate myself or, you know . . . .")

[4] E.g., July 26, 2011, Tr. 251-52 ("Obviously I'm not going to be able to deny some of the allegations that are made, and you'll see why. . . . [But] there's more to the story."); July 27, 2011, Tr. 574-78 (cross-examination of Matheson); id. at 589-92 (cross-examination of Tiefenbach); July 28, 2011, Tr. 715-23 (implying in summation that others might have been involved in the bank-fraud and identity-theft schemes).

E. <u>Ineffective Assistance of Counsel</u>

Stringer complains that his second court-appointed attorney, Stanislao Germán, was "ineffective," "at times incompetent," and "at times derelict of his duty" both before trial, when Germán represented Stringer, and at trial, when Stringer represented himself and Germán served as standby counsel. Def.'s Br. 20. Stringer claims, inter alia, that Germán "misrepresented legal issues to the Court" and "lied to the defendant about several incidents and information"; that he "continues to ignore the defendant's requests for information that is known to exist, and withholds the information and documents to protect his own interests over the legal needs of the defendant"; and that Germán has taken steps to ensure that a private investigator tasked with investigating Stringer's case be "kept from the defendant." <u>Id.</u> at 20-21.

Under <u>Strickland v. Washington</u>, to establish ineffective assistance of counsel, Stringer "must (1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms'; and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." <u>United States v. Cohen</u>, 427 F.3d 164, 167 (2d Cir. 2005), quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 693 (1984). "[T]he burden rests on the accused to demonstrate a constitutional violation." <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984). As the Second Circuit has explained:

> To satisfy the first prong [of the <u>Strickland</u> test] – the performance prong – the record must demonstrate that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Such errors include omissions that cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness. Under the second prong – the prejudice prong – a reasonable probability of a different result is a probability sufficient to undermine confidence in the outcome. The prejudice prong can be satisfied even if the errors of counsel cannot be shown by a preponderance of the

evidence to have determined the outcome.

Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (internal quotation marks, brackets, and citations omitted). A defense attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Strickland, 466 U.S. at 690, and the Second Circuit instructs that even "strategic choices made after less than complete investigation do not amount to ineffective assistance – so long as the known facts made it reasonable to believe that further investigation was unnecessary," Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005).

But because the "object of an ineffectiveness claim is not to grade counsel's performance," the Supreme Court has instructed lower courts:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Strickland, 466 U.S. at 697; see also Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991) ("We need not address the[] alleged deficiencies [in defense counsel's performance] because we conclude that [defendant] cannot satisfy the second prejudice prong of Strickland, given the overwhelming evidence of guilt adduced at trial."). Although this Court observed Germán's performance as Stringer's appointed counsel, and saw nothing that would suggest his

performance "fell below an objective standard of reasonableness" set by "prevailing professional

norms," Strickland, 466 U.S. at 690, the Court need not evaluate his performance here, as "it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," id. at

697.

　　　To demonstrate prejudice, "the defendant must show that . . . 'there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding below would

have been different.'" Puglisi v. United States, 586 F.3d 209, 215 (2d Cir. 2009), quoting

Strickland, 466 U.S. at 694.  Stringer has not made that showing here.  His claim of prejudice

boils down to the assertion that (1) he did not receive a note from his private investigator that the

investigator handed to Germán when Germán was acting as Stringer's standby counsel during

trial; (2) before trial, Germán refused to track down copies of phone records that Stringer

contends "would have absolutely changed the verdict in this case," at least with respect to Count

Two, because they "would have proved that Jeffrey Tiefenbach had contact in much the same

way that Dean Matheson had contact with persons responsible for the charges in this case"; (3)

Germán "did not include relevant and known information in the Motion to Dismiss Indictment,"

including "the names of the missing witnesses"; and (4) Germán failed "to investigate evidence,

witnesses, phone records and the like" – steps that Stringer claims "would have proven critical in

the defense of this case" – and Germán's failure to take these steps meant that Stringer "was not

able to put up a valid defense as [Germán] hindered his efforts and ultimately denied him any

effective defense of his case." Def.'s Br. 20-21.

　　　Here, however, "[t]he evidence adduced at trial was so overwhelming that we cannot say

there is a reasonable probability that had the alleged errors in [Germán's] performance not

occurred the result of the proceeding would have been different." See Strouse, 928 F.2d at 556

(internal quotation marks omitted).  Even if the Court assumes as true Stringer's assertion that

Germán refused to track down copies of certain phone records, there is no reason for this Court

to credit Stringer's self-serving, ex-post claim that the records would have established his

innocence with respect to Count Two.  "It is not enough for the defendant to show that the errors

had *some conceivable effect* on the outcome of the proceeding.  Virtually every act or omission of

counsel would meet that test, and not every error that conceivably could have influenced the

outcome undermines the reliability of the result of the proceeding."  Strickland, 466 U.S. at 693

(citation omitted) (emphasis added).  Rather, the defendant must show that there is a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  Id. at 694.  Stringer's vague and conclusory allegations about the prejudice he

suffered as a result of Germán's performance before trial do not come close to meeting that

standard.  As explained in the Court's October 24, 2011, order, Stringer's subsequent appointed

counsel, Maffeo, affirmed to the Court that both he and Germán have turned over to Stringer all

relevant legal materials in their possession.  See Oct. 24, 2011, Order; Oct. 11, 2011, Tr. 18-20,

27-29.  The Court, based on its firsthand observations of Maffeo, Germán, and Stringer, has no

reason to doubt the attorneys' representations, and ample reason to conclude that Stringer's

allegations of duplicity and incompetence are not credible.

  In any event, Stringer provides no details about what he believes these records would

have shown, except to speculate that certain "phone records" that Germán allegedly failed to

procure "would have proved that Jeffrey Tiefenbach had contact in much the same way that Dean

Matheson had contact with persons responsible for the charges in this case.  Having and knowing

that information for trial would have rendered a not guilty verdict for Jeffrey Tiefenbach, just as

it did for Dean Matheson."  Def.'s Br. 20.  Stringer utterly fails to explain who these "persons

responsible" for the crimes may have been, or the basis for his suggestion that Tiefenbach had

contact with them. Such speculation does not come close to supporting a claim of ineffective

assistance of counsel.

Furthermore, any allegations about Germán's performance *at trial* fail for the simple

reason that by the time trial began, Germán had switched roles and was acting as Stringer's

standby counsel. A pro se defendant does not enjoy "a constitutional right to standby counsel,"

and thus "is not entitled to relief for the ineffectiveness of standby counsel." United States v.

Morrison, 153 F.3d 34, 55 (2d Cir. 1998). Accordingly, Stringer is barred from raising an

ineffective-assistance claim based on Germán's performance at trial. Indeed, in warning Stringer

about the risks of electing to proceed pro se, the Court repeatedly informed Stringer that he

would be foregoing the ability to raise a claim later of ineffective assistance from his standby

counsel – a warning Stringer seems to have forgotten or ignored. In any event, because Stringer

clearly "retained control of his own defense throughout the proceedings, so that his standby

counsel was in reality, as well as in name, only that," see id., the Court need not determine

whether Germán provided effective standby assistance.

F. Brady Materials

Stringer claims that "[t]he government withheld evidence from" him – evidence "critical

to the defense" – in violation of Brady v. Maryland, 373 U.S. 83 (1963). Def.'s Br. 22. To

show a Brady violation, he must establish that "(1) the Government, either willfully or

inadvertently, suppressed evidence," that "(2) the evidence at issue is favorable to the defendant,"

and that "(3) the failure to disclose this evidence resulted in prejudice." In re United States

(Coppa), 267 F.3d 132, 140 (2d Cir. 2001).

Among the evidence that Stringer claims the government withheld was unspecified

28

information about certain "defense witnesses to be called on his case." Def.'s Br. 22. Stringer does not explain, however, how the government interfered with his ability to find or contact these individuals, or somehow prevented him from calling them as witnesses. He does not come close to alleging a genuine Brady violation with respect to these individuals.

Stringer also claims that "two months after trial," staff of the Metropolitan Correctional Center ("MCC"), where he was being held, "delivered legal mail to the defendant that was dated and sent from" the private investigator who had worked on Stringer's behalf in the Florida state case. Id. That mail allegedly "contained 'Brady material', information and evidence that would have been used during trial," but the mail "was kept from [him] until after" the present trial had concluded. Id.; see also id. at 23 ("The government caused the legal mail sent to the defendant, not to be received until two months after it was sent, two months after his trial. The information in the legal mail is Brady material and would have absolutely changed the outcome of the trial, had it been available for use during trial, as part of the defendant's defense.").

Stringer asserts, without any support, that "[t]he government knew of the content of this legal mail, and there is evidence to support that the relevant and critical information was deliberately withheld. . . . The government knows this evidence, discovery, 3500 material exists, knows that it has the potential to exonerate the defendant for all or part of the charges in this case, and the government withheld this information from the defendant." Id. at 23-24. In addition, Stringer claims that an FBI agent who worked on his case, but who was not called as a witness, "has direct knowledge of someone other than the defendant being responsible for the charges in this case." Id. at 23.

Again, Stringer says nothing about the content or import of these materials, or how they would have been used at trial. Nor does he explain who the other persons who supposedly

committed the crimes are, or why he believes that the FBI agent was aware of their identities. His vague and unsupported allegations do not suggest that the evidence he claims took too long to reach him before his trial might reasonably have "affected the outcome of the case." Coppa, 267 F.3d at 135. Nor has Stringer provided any reason, beyond the barest of conclusory assertions, to believe that the government "suppressed evidence." That he may have received materials from his Florida state proceedings later than he would have liked – materials mailed by a private investigator appointed by a Florida court – provides no basis from which to conclude that the federal government committed a Brady violation here. Accordingly, the Court rejects Stringer's Brady claim.

> G. Other Requests for Relief

After filing his Rule 29 and 33 motions, Stringer submitted additional papers to this Court requesting other relief. Much of this material repeats issues that Stringer has already raised in pre-trial and post-trial conferences and on which this Court has already ruled.

> 1. November 1, 2011, Letter

Stringer sent this Court a letter dated November 1, 2011, concerning an earlier letter that he said he attempted to send to the Court on October 12, 2011, but that went to Judge Hellerstein by mistake. Judge Hellerstein returned the letter to Stringer in late October. In the November 1 letter, forwarding the October 12 letter to us, Stringer stated that because the Court had not had the chance to consider "[t]he 'EXTREMELY RELEVANT ISSUES'" raised in his October 12 letter, the Court might need to "reconsider[]" some previous rulings. A review of the October 12 letter makes clear that no such reconsideration is necessary. In that letter, Stringer asked this Court to order a private investigator named Joseph Dwyer to return Stringer's phone calls and "complete services rendered" so that Stringer could "proceed in effectively preparing [his] Rule

29/33 Motion(s)." Def.'s Oct. 12, 2011, Letter 1.  Neither Stringer's October 12 letter nor his

November 1 letter raised any new issues.  Stringer had previously made similar requests during

conferences with the Court, and the Court had denied them, for reasons explained on the record

in open court and in a previous written order.  See Oct. 24, 2011, Order ("Maffeo represented to

the Court that he has spoken with Mr. German at length about this case, that Mr. German has

been 'very cooperative,' and that Mr. Stringer now possesses copies of all relevant legal

materials.  See Oct. 11, 2011, Tr. 18-20, 27-29.  As for the private investigator, Mr. Stringer

provides no reason to think that anything the investigator did in preparation for trial is in any way

relevant to any post-trial motions that Mr. Stringer wishes to make.").

### 2.  Motion to Compel / Leave to Supplement

After filing his Rule 29/33 motion, Stringer filed a "Motion to Compel / Leave to

Supplement," dated November 14, 2011, in which he requested that this Court "COMPEL"

Germán and private investigator Dwyer "to respond immediately by providing all documents and

information requested" by Stringer in two previous subpoenas.  Mot. to Compel / Leave to

Supplement 1.  This information, Stringer claimed, was "critical and relevant to his case, trial

and now post-trial motions."  Id.  Attached to the motion were two subpoenas, dated October 26,

2011, seeking to compel Germán and Dwyer to produce "all notes, communications, instructions,

reports, invoices, receipts, letters, electronic and written, specifically relevant to" Germán,

Dwyer, Stringer, and this case.  The Court denies the motion and quashes the subpoenas.

These subpoenas, because they request production of documents, appear to be brought

under Rule 17(c) of the Federal Rules of Criminal Procedure, which provides that

> [a] subpoena may order the witness to produce any books, papers,
> documents, data or other objects the subpoena designates.  The
> court may direct the witness to produce the designated items in

> court before trial or before they are to be offered in evidence.
> When the items arrive, the court may permit the parties and their
> attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c)(1). The Rule is not, however, "a method of discovery in criminal cases," and "courts must be careful" that the Rule "is not turned into a broad discovery device." United States v. Cherry, 876 F. Supp. 547, 552 (S.D.N.Y. 1995). The Rule "may be used to obtain only evidentiary materials." Id.; see also United States v. Marchisio, 344 F.2d 653, 669 (2d Cir. 1965). As the Second Circuit has explained, the Rule is designed to allow a defendant "before trial" to obtain materials that may be used "as evidence," but was *not* designed

> to provide an additional means of discovery. Its purpose is rather
> that of the traditional subpoena duces tecum, to permit a party to
> obtain books, papers, documents or other objects for use by him as
> evidence. . . . Rule 17(c) is a device solely for the obtaining of
> evidence for the use of the moving party, permitting him to
> examine the material obtained before trial only where, in the
> discretion of the court, it is necessary that he do so in order to
> make use of the material as evidence.

United States v. Murray, 297 F.2d 812, 821 (2d Cir. 1962) (internal quotation marks and citation omitted); see also Bowman Dairy Co. V. United States, 341 U.S. 214, 220 (1951). The Rule does not permit a defendant to subpoena documents where, as here, a trial has already ended and the defendant has been convicted.

In any event, Stringer has failed to demonstrate, as he must, "that the materials sought are: (1) relevant; (2) admissible; and (3) specifically identified," Cherry, 876 F. Supp. at 552, rather than part of "a general fishing expedition," United States v. Nixon, 418 U.S. 683, 700 (1974) (internal quotation marks omitted). As explained above, Maffeo and Germán have already represented to the Court that they have turned over to Stringer all relevant legal materials, and the Court, based on its own observations before, during, and after trial, credits these

representations.  The motion to compel is therefore denied, the subpoenas are quashed, and the request for leave to supplement is denied as moot.

### 3. Motion to Fully Disclose/Unseal Records/Documents

Stringer filed another post-trial motion, dated November 15, 2011, requesting that the Court "'unseal documents' and 'docket/file letter filings', so that the record of the Court is fully disclosed and available to the public record," specifically "that docket entry #34 . . . be unsealed," "docket entry #55 . . . be unsealed," Stringer's October 21, 2011, letter to the Court "be placed on the record," "that all letters from the defendant . . . sent to either Judge Berman or Judge Lynch, from June 2010 to present, be placed on the record of the Court," and that "all transcripts from all hearings," including ex parte hearings, "also be made available for public record." Id.  The government has not objected to these requests, and the Court sees no reason to deny them.  Indeed, the various sealed materials were sealed in the first place only because Stringer requested that certain of his communications be made ex parte so as not to reveal his trial strategy to the government.  Any necessity for their sealing for this purpose is now past. Accordingly, the Court will order that those materials be unsealed and/or docketed.

### CONCLUSION

The Court has considered Stringer's other arguments and finds them to be without merit. For the reasons stated above, Stringer's motions for acquittal or, in the alternative, for a new trial are DENIED.

Stringer's motion to unseal or place the specified materials in the record is GRANTED.

SO ORDERED.

Dated: New York, New York
      January 3, 2012

                                  GERARD E. LYNCH
                        United States Circuit Judge,
                          sitting by designation